J-A29005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S.B., JR. A/K/A A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1275 EDA 2017 |

Appeal from the Order Entered March 15, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000959-2016,
CP-51-DP-0000653-2011

BEFORE:   LAZARUS, J., PLATT*, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 13, 2017**

A.B., Sr. ("Father") appeals from the trial court's order involuntarily terminating his parental rights to his minor son, A.S.B. ("Child") (born 1/10). After careful review, we affirm based upon the cogent opinion authored by the Honorable Joseph Fernandes.

Child was first brought to the attention of the Philadelphia Department of Human Services ("DHS") when it received a report in March 2011 that Child had been found in the care of his paternal grandmother, who was unconscious due to a drug overdose.  DHS's Motion to Compel Cooperation with Child Protective Services Investigation of Abuse and/or Neglect, 4/1/11, at c.[1]  Over

---

[1] We note a discrepancy in the trial court opinion where it indicates that Child's Mother had overdosed and been rushed to a hospital.  ***See*** Trial Court Opinion, at 7/21/17, at 1.  In fact, it was paternal grandmother, in whose care Parents

---

*   Retired Senior Judge assigned to the Superior Court.

the next several months, DHS visited the home of family members caring for Child, where reports of unsanitary home conditions were substantiated. Finally, in December 2011, amidst allegations of family members using drugs, DHS filed an emergent dependency petition. In January 2012, the court held a hearing and adjudicated Child dependent; DHS was ordered to supervise Child while family members continued to care for him. In March 2012, the court ordered DHS to obtain protective custody of Child.

At this time, Father, a known drug user, was given the following objectives as part of a Family Service Plan ("FSP"): receive drug and alcohol and mental health treatment, complete a parenting capacity evaluation ("PCE"), obtain stable and appropriate housing, and attend supervised visits. In August 2012, Child was placed in a foster home; parents were granted supervised visits. Throughout the ensuing years, Father demonstrated inconsistency with regard to his FSP objectives. Child was adjudicated dependent for a second time on September 18, 2015, and he has been in foster care, under the custody of DHS, since August 2015.[2]

_____

had left Child, who was rendered unconscious from an apparent overdose. Father and Mother, however, had been arrested at the same time surrounding reports of domestic violence.

[2] Child was placed in the custody of DHS and placed in foster care three times in August 2012, December 2013, and finally in August 2015.

On October 17, 2016, DHS filed a petition to involuntarily terminate Father's parental rights to Child. The trial court held a two-day termination hearing on January 17, 2017[3] and March 15, 2017, at which case manager, Curtis Tate, and Father testified. On March 15, 2017, the trial court entered an order terminating Father's parental rights to Child pursuant to sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act,[4] and changed the goal to adoption. Specifically, the court found Father's testimony not credible, that he had not completed his stated objectives under the FSP, and that there was no paternal bond with Child. N.T. Termination Hearing, 3/15/17, at 27.

Father filed a timely appeal and Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. On appeal, Father presents the following issue for our consideration: Did the trial court err or abuse its discretion when it determined that DHS had met its burden of proof and then terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8),[5] and (b), and changed the permanency goal to adoption pursuant to 42 Pa.C.S. § 6301, *et seq*.?

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish

---

[3] Father attended the second day, not the first day, of the termination proceedings.

[4] 23 Pa.C.S. §§ 2101-2910.

[5] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

While Father correctly acknowledges that it is petitioner's burden to prove, by clear and convincing evidence, that termination is proper under sections 2511(a) and (b), Father's sole legal argument on appeal is that "other than Father's own testimony, the record of this case is that the court simply has too little information to test the information he has provided, and therefore cannot [terminate under sections 2511(a)(1), (2), (5), (8)]" and

that there is "absolutely NO information directly from this 7-year-old child [to terminate under section 2511(b)]." Appellant's Brief, at 23-26.

DHS best describes parents' performance since Child was declared dependent and put in placement as "yo-yo[ing] between compliance and non-compliance with their objectives." Appellee's Brief, at 4.[6] Essentially, Father

_____

[6] Father takes issue with the trial court's and DHS's reliance upon an exhibit ("Exhibit A"), which he claims was never moved or accepted into evidence below. Father, therefore, claims that the exhibit cannot be considered competent evidence upon which to rely on for termination. **See** Appellant's Brief, at 7. Exhibit "A" consists of a 32-page recitation of facts regarding the case. Father is correct that it was not a part of the exhibits explicitly entered into evidence during the termination hearings. It is well known that "[a] trial court may not consider evidence outside of the record in making its determination. Nor may this Court uphold a trial court's order on the basis of off-the-record facts." **Ney v. Ney**, 917 A.2d 863, 866 (Pa. Super. 2007) (internal citations and quotation marks omitted); **see also M.P. v. M.P.**, 54 A.3d 950, 954 (Pa. Super. 2012) (trial court may not consider evidence outside record in making decision).

While Father accepts the trial court's recitation of the facts and procedural background in its Rule 1925(a) opinion, he "specifically challenges the 'Factual and Procedural Background' of the lower court's Opinion insofar as it includes allegations of the DHS 'Exhibit A' which is not properly in evidence." **Id.** We note that at the January termination hearing, the court entered Exhibits 1-17 into evidence, as well as a copy of Child's birth certificate. **See** N.T. Termination Hearing, 1/17/17, at 9; **id.** 3/15/17, at 4. The parties also agreed to a stipulated trial and that if called to testify "CUA will testify to the facts alleged in the petition." N.T. Termination Hearing, 1/17/17, at 8; **id.** 3/15/17, at 4. Moreover, on January 17, 2017, the court specifically entered a separate order entering Exhibits 1-17 into evidence. Order, 1/17/17. Exhibit "1" consists of case files, detailed permanency review orders that contain findings, docket entries from Child's dependency case, case event outcomes, substance testing results, and trial court CEU progress reports. To the extent that the trial court may have relied upon information contained in Exhibit A in its factual and procedural background, we note that the majority if not all of this information was also contained within properly

- 5 -

relapsed throughout Child's placement, failed to complete a court-ordered PCE, minimally complied with his FSP objectives, consistently missed his visits with Child, failed to take Child to medical appointments, and was incarcerated during periods of Child's placement. Father's transgressions and inability to actively and positively parent Child caused Child to enter and exit foster care three times over the course of three years. Child had been in foster care for a period of 16 consecutive months at the time of the termination proceedings. Child, who is now seven-years-old, needs stability and permanency. He is in a loving and nurturing home where he has bonded with his foster parent; adoption is in his best interests.[7]

After careful consideration of the notes of testimony from the two-day termination hearing, the remainder of the certified record, the parties' briefs and relevant case law, we affirm on the basis of Judge Fernandes' Rule 1925(a) opinion. We instruct the parties to attach a copy of Judge Fernandes' decision in the event of further proceedings in the matter.

Order affirmed.

_____

admitted Exhibits 1-17. Therefore, we do not find this to be a ground for reversal where the properly admitted evidence otherwise supports termination.

[7] At the termination hearing, Tate indicated that Child's foster resource parent is interested in adopting him. N.T. Termination Hearing, 1/17/17, at 19.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2017

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of A. B. Jr., a minor | : | CP-51-DP-0000653-2011 |
| | : | CP-51-AP-0000959-2016 |
| | : | |
| | : | 51-FN-001680-2011 |
| | : | |
| APPEAL of: A. B., Father | : | 1275 EDA 2017 |

OPINION[1]

Fernandes, J.:

Appellant A.B. ("Father") appeals from the order entered on March 15, 2017, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to A. B., Jr. ("Child") pursuant to the Adoption Act, 23 Pa. C. S. A. §2511(a)(1), (2), (5), (8), and (b). Maureen Pié, Esq., counsel for Father, filed a timely Notice of Appeal with a Statement of Matter Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on March 21, 2011, when DHS received an Emergency General Protective Services ("EGPS") report alleging that on March 19, 2011, the Child was left in the care of his paternal grandmother ("PGM"); that the Child's mother ("Mother") was found unconscious from a drug overdose in the home with the Child present; that Mother was taken to a hospital; that on March 19, 2011, Mother and Father were arrested; that on March 21, 2011, Father removed the Child from the home of his temporary caregiver ("TC"), who was the kinship caregiver for the Child's paternal half-sibling ("Sibling"); that drug activity occurred in the home of Mother and Father, who resided together; and that PGM used and sold drugs. The report was found to be valid. DHS tried multiple times to visit the home to investigate the allegations and left multiple letters throughout the month of March 2011.

On November 15, 2011, DHS received another EGPS report alleging that the Child's home was filthy and infested with cockroaches; that Mother and Father appeared to be drug users. The report

---

[1] The trial court requested the Notes of Testimony on March 16, 2017. Subsequent requests were made on June 6, 2017, and June 15, 2017. The trial court received all Notes of Testimony by June 21, 2017.

was found to be valid. DHS visited the home on November 16, 2011, and determined that the home was adequate for the Child. Both Mother and Father denied the EGPS allegations and did not appear to be under the influence of drugs at that time. On November 16, 2011, Mother and Father agreed to accept In-Home Protective Services ("IHPS"), and they signed a Safety Plan stating that TC would monitor the Child's safety in the home and maintain contact with the family. Father enrolled in an inpatient drug and alcohol treatment program at Fairmount Behavioral Health System ("Fairmount BHS") in November 2011, but DHS learned that Father had left the program against medical device in the same month. On December 8, 2011, DHS filed an urgent dependency petition for the Child, which alleged that Father had a history of drug abuse and had been diagnosed with post-traumatic stress disorder ("PTSD") and bipolar disorder; and that PGM had been suffering from a bulging disc in her back and diabetes and had been prescribed narcotic pain medication, but also had a history of drug abuse. On January 3, 2012, the Child was adjudicated dependent and DHS was ordered to supervise. Mother and Father were referred to the Clinical Evaluation Unit ("CEU") for a drug screen, and a dual diagnosis assessment and monitoring. On February 23, 2012, Father was assessed by the CEU; Father's positive drug screen for benzodiazepines was substantiated by his prescription for Xanax. Father reported that he was incarcerated for four months in 2008 for aggravated assault and that he had a pending criminal matter for a 2010 drug possession charge. On March 9, 2012, the CEU provided a report of non-compliance for Father. The CEU reported that on January 3, 2012, Father tested positive for opiates and benzodiazepines, and did not stay for his evaluation. Father rescheduled his evaluation appointment multiple times, before being evaluated and recommended by the CEU to remain in methadone maintenance treatment. The CEU was not able to obtain information regarding Father's treatment and progress; it was Father's responsibility to provide the CEU with documentation of his attendance. On March 20, 2012, the court ordered DHS to obtain an Order of Protective Custody ("OPC") for the Child if Mother and Father were not compliant with services, drug screens, drug and alcohol treatment, and signing releases. Mother and Father were ordered to the CEU for a forthwith drug screen, dual diagnosis assessment and monitoring. The CEU issued another report of non-compliance for Father on June 11, 2012. Father tested positive for opiates on March 20, 2012. At a review hearing on June 12, 2012, the court ordered Mother and Father to sign all releases and follow all recommendations and Father to provide the CEU with documentation of methadone maintenance attendance. Father tested positive for opiates and

marijuana on June 12, 2012. On July 30, 2012, Father reported attending the Kirkbride Treatment Facility since July 1, 2012, and being compliant with all treatment mandates; Kirkbride reported that Father's after-care plan would be to attend Intensive Outpatient ("IOP") treatment.

On August 21, 2012, DHS received a General Protective Services ("GPS") report which alleged that Father was found in the home unconscious while in a caretaking capacity and that Father was under the influence of a controlled substance. The report was found to be valid. That same day, DHS obtained an OPC and placed the Child in a foster home through Friendship House. At the shelter care hearing on August 23, 2012, the court lifted the OPC and committed the Child to DHS custody. Mother and Father were granted supervised visits. The CEU issued a report of non-compliance for Father on November 12, 2012; Father tested positive for barbiturates on July 31, 2012 and failed to comply with court orders to complete a CEU assessment after August 23, 2012. On February 4, 2013, the CEU reported that Father had a negative drug screen on January 25, 2013, and was compliant with his IOP methadone maintenance treatment, which he reportedly began on October 16, 2012. On February 6, 2013, the court found Father to be fully compliant and he was granted unsupervised visits. DHS was ordered to explore reunification of the Child with Father. On May 8, 2013, the court ordered that after three successful overnight visits, the Child could be reunified with Father; however, if Father's drug screens came back positive, visits were to be modified back to weekly day visits. Father was to be referred to the Achieving Reunification Center ("ARC") and the CEU for a forthwith drug screen and to sign releases for his records. Father was successfully discharged from treatment at the Narcotic Addiction Rehabilitation Program ("NARP") on February 15, 2013. On June 11, 2013, at an emergency listing for a permanency review, the court ordered Father's visitation to revert to supervised and ordered that visits could be returned to unsupervised if Father provided negative drug screens. On September 12, 2013, the Child was reunified with Mother at Family House Now, a mother/baby drug and alcohol treatment facility. On December 2, 2013, the CEU reported that Father tested negative for drugs on September 11, 2013, and had been successfully discharged from Self Help Movement Halfway House on October 14, 2013.

On December 3, 2013, Mother was unsuccessfully discharged from Family House Now and the Child was placed back in his previous foster home on that date. On December 4, 2013, at a permanency review hearing, the court ordered that Father have unsupervised community visits and

referred him to the CEU for a forthwith screen and one random drug screen; if Father's drug screens came back positive, Father's visits were to be supervised at the agency. The court also ordered DHS to assess Father's home and granted Father overnight visits if appropriate. On September 14, 2014, at a permanency review hearing, the court ordered Father to have biweekly supervised visits at the agency and that Father was to provide a copy of his lease to DHS. On March 11, 2015, Mother was re-admitted to Family House Now and the Child was reunified with Mother and the commitment to DHS discharged and supervision implemented via an administrative order from the court on March 12, 2015.

On August 20, 2015, DHS received a GPS report alleging that Mother was found slumped over on steps with the Child sitting next to her. The report was found to valid. After being found by paramedics, the Child was returned to his prior foster home. On August 26, 2015, Father informed DHS that he and his paramour were residing in a hotel room with one bed near Neshaminy Mall, outside of Philadelphia. That same day, DHS obtained an OPC for the Child and he was placed with his former foster parent through Friendship House. At the shelter care hearing on August 27, 2015, the court ordered the OPC lifted and the temporary commitment to DHS stand. On September 18, 2015, the Child was adjudicated dependent and fully committed to DHS custody. Mother and Father were granted biweekly supervised visits. Father failed to make his appointment for his Parenting Capacity Evaluation ("PCE") on September 2, 2016.

On October 17, 2016, DHS filed petitions to terminate Mother and Father's parental rights and change the goal from reunification to adoption.[2] The petitions for goal change and termination were heard on January 17, 2017, and March 15, 2017. At the time, the Child was six years old and had been in care for a cumulative total of sixteen months. Father was not present at the January 17, 2017, hearing. The trial court determined that DHS made reasonable good faith efforts to serve Father. All parties stipulated to the facts of the case. (N.T. 1/17/17, pgs. 4-10, 18).

CUA testified that Father was not compliant with any of his SCP objectives. Father's single case plan ("SCP") objectives were to attend drug and alcohol mental health treatment; to attend mental health treatment; to complete a PCE; to obtain appropriate housing; and to consistently attend his supervised visits with the Child. CUA was unable to reach Father and has not had contact with

---

[2] The trial court terminated Mother's and Father's rights on March 15, 2017. Only Father appealed.

Father since August 2016, when CUA gave Father the information for his PCE. CUA testified that he went out to the house several times, including the Friday before the hearing, but no one answered the door. CUA testified that he met with Father only once or twice, during which he informed Father of the PCE that was scheduled. CUA testified that Father did not show up for his three random drug screens at the CEU since the last court date. CUA testified that Father last appeared at the CEU on August 17, 2016. Father is not enrolled in any drug and alcohol or mental health treatment. CUA testified that Father does not have suitable housing. Father has bi-weekly supervised visits at the agency. Father has not been visiting with the Child. Father's last visit with the Child was in August 2016. Father does not attend the Child's medical appointments. Child is in the first grade and is doing well, with the exception of a little trouble in math. Child receives mobile therapy through Interact. The Child also has an IEP. The Child is in a safe, permanent, and pre-adoptive home. The Child has a good relationship to the Foster Parent and is bonded to her. The Child reported feeling safe and comfortable with the Foster Parent. The Foster Parent and the Child have a very caring and loving relationship. The Foster Parent takes care of all of the Child's needs. The Child looks to the Foster Parent to meet his everyday needs. (N.T. 1/17/17, pgs. 5-19).

On January 17, 2017, the trial court held its decision in abeyance to allow parents to sign voluntary relinquishments of their parental rights. Neither of the parents signed and Father appeared at the March 15, 2017, court date. (N.T. 3/15/17, pgs. 3-5). Father claimed that he completed his drug screens and that he last took a drug screen in January 2017. The most recent CEU report was dated November 1, 2016, and listed Father's last drug screen to be on October 26, 2016. Father tested negative with traces of cocaine on the October 2016 drug screen. The report also noted that Father did not stay for his assessment, even though he had already rescheduled at least twice. Father claimed that no one called him to come in for his random screens, so he went to the CEU on his own and completed a drug screen in January 2017. Father testified that he did not receive the results for the drug January 2017 drug screen. Father testified that he last contacted the CUA case manager in January 2017. Father also testified that CUA did not reach out to him since the last court date. Father claimed that he had already completed assessments for the CEU and did not know that he had another to complete. Father admitted that he has not engaged in mental health treatment or completed a drug and alcohol assessment. Father claimed to be unaware of any SCP objectives other than appearing at the CEU for the assessment and drug screens. Father admitted,

however, that he was aware that he had to get stable housing. Father testified that he has housing and is living in a two-bedroom house with his paramour and other child. The other child, who is not involved with DHS, only lives with Father part-time, about two days each week. Father testified that CUA was ordered to assess his home after the last court date, but admitted that an assessment had not been scheduled. In addition, Father testified that he moved to a new address on March 13, 2017, and did not request CUA to assess the new home. Father testified that the new home is an apartment on the first floor of a house. Father claimed to have stable housing at both the new and the former addresses, but CUA had not assessed either home. Father testified that he provided CUA with the information of his paramour, the only person living directly with him, for background and clearances. Father testified that he did not provide the information for the other people living in the house because the separate rooms were individually locked, like in a boarding home. Father claimed that Mother informed him that neither of them were allowed to visit with the Child anymore. Father testified that his last visit with the Child was approximately in late October 2016. Prior to stopping visits, Father testified that he visited the Child every week at first, then every other week. Father testified that he missed some visits and then was informed that he was not allowed to visit with Child. Father testified that he did not contact the court because of his criminal case for which he was incarcerated on a burglary charge for three months in early 2016. Father is still on probation. Father testified that he had not been receiving all of his mail at this former address. Father also testified that he called the police on his landlord due to the lack of mail, but he could not prove that the landlord was holding his mail. Father testified that he learned about the March 15, 2017, court date from Mother. Father also testified that Mother told him about the January 17, 2017, after it had passed. (N.T. 3/15/17, pgs. 5-22). On March 15, 2017, after reopening the record to allow Father to testify, the trial court terminated Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8), and (b), and changed the goal to adoption.

**Discussion:**

Father avers that the Trial court erred in determining that:

1. [DHS] had met its burden of proof by clear and convincing evidence that Father evidenced a settled purpose of relinquishing his claim to the [Child] or has refused or failed to perform parental duties, for at least six months immediately preceding the filing of the petition;

2. DHS had met its burden of proof that Father has shown repeated and continued incapacity, abuse, neglect or refusal causing the [Child] to be without essential parental care, control or subsistence necessary for the [Child's] physical or mental well-being;

3. DHS had met its burden of proof that the conditions and causes of any such incapacity, abuse, neglect, or refusal cannot or will not be remedied by Father;

4. DHS had met it burden of proof that the conditions which led to the removal of the [Child] continue to exist;

5. DHS had met its burden of proof that the services or assistance reasonably available to Father are not likely to remedy the conditions which led to the removal of the [Child] within a reasonable period of time and erred in determining that DHS had made reasonable efforts to reunify this family;

6. DHS had met its burden of proof that services or assistance were reasonably available to Father;

7. DHS has met its burden of proof that changing the [Child's] permanency goal to adoption and terminating Father's rights would best serve the needs and welfare of the [Child];

8. Father reserves the right to file a supplemental statement once the Notes of Testimony of the Goal Change/Termination of Parental Rights Hearing on March 15, 2017, are transcribed and made available to counsel.

Father has not submitted a supplement to his Concise Statement of Errors pursuant to issue 8, so Father has waived those issues on appeal. *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006). *See also In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009); *In re C.P.*, 901 A.2d 516, 522; *In re J.E.D.*, 879 A.2d 288, 293, fn. 7 (Pa. Super. 2005). For this reason, this opinion will only address the issues appealed in 1 through 7. At the same time, for the purpose of this opinion, Father's issues 1 through 7 will be consolidated to read: Did the trial court err or abuse its discretion when it terminated Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8), and (b), and changed the permanency goal to adoption?

Father has appealed the involuntary termination of his parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa. C. S. A. §2511(a), which provides the following grounds for §2511(a)(1):

(a) **General rule** – The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights, the burden of proof is on the party seeking termination which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

The petition for involuntary termination was filed against Father on October 17, 2016. For the six month period prior to filing, Father was not successfully completing his SCP objectives. Father was non-compliant with his SCP objectives. (N.T. 1/17/17, pgs. 10-11, 15-16). CUA testified that Father has not been in contact with CUA since August 2016. CUA testified that he went to Father's known address several times, including the week before the termination trial, but no one answered. CUA provided Father with the date and time for his scheduled PCE personally. Father was aware of his PCE objective, but still did not complete his PCE. (N.T. 1/17/17, pgs. 7, 11, 15-16). Father has not shown up for his court-ordered drug screens at the CEU since the last court date. Father claimed that no one called him to appear for his random drug screens, so he went on his own to the CEU for a drug screen in January 2017, but did not receive the results. However, the most recent CEU report has Father's last drug screen being on October 2016, with Father testing negative with traces of cocaine. Father admitted that he has not engaged in mental health treatment or completed a drug and alcohol assessment. Father is not enrolled in any dual diagnosis drug and

alcohol treatment program. (N.T. 1/17/17, pgs. 7-8, 15-16; N.T. 3/15/17, pgs. 6-9). CUA testified that Father does not have suitable housing. A review of the record establishes that Father was referred to ARC for services. Father testified that he is living in a two-bedroom house with his paramour and another child. CUA was ordered to assess the home, but Father admitted that he did not schedule an appointment. Father recently moved to a new address which is an apartment on the first floor of a house. Father claimed that both his current and previous homes were stable, but CUA never assessed them. Father only provided CUA with information regarding his paramour and other child for clearances, not the other people who live in the house. Father's housing is similar to a rooming house. (N.T. 1/17/17, pg. 16; N.T. 3/15/17, pgs. 5-6, 10-12, 15, 17-19). Father currently has bi-weekly supervised visits at the agency. Father has not visited with the Child since August 2016. Father admitted that he missed some visits. Father claimed to have visited the Child last in October 2016, shortly after which Father claimed that Mother informed him that he was not allowed to visit the Child anymore. Father did not reach out to CUA or his attorney to determine if his visits were in fact suspended. Father claimed that he did not reach out to the court because of his case in criminal court; Father is currently on probation for a burglary charge. Father was incarcerated for a period of time. Additionally, Father has not attended any of the Child's medical appointments. (N.T. 1/17/17, pgs. 16, 19; N.T. 3/15/17, pgs. 13-14, 19-21). Over the six months prior to the filing of the petition, Father failed to perform his parental duties by his consistent failure to successfully complete all of his SCP objectives. Father's inability to perform his parental duties is not limited to the six month period but extends throughout the life of the case. The Child has been in care for a total of sixteen months. This is the third time in care for the Child. Father has an affirmative duty to place himself in a parenting position and has been given ample opportunity to do so throughout the life of the case. Father evidenced a settled purpose of relinquishing parental claim to the Child by failing and refusing to perform his parental duties. Since these facts were demonstrated by clear and convincing evidence, the trial court did not err or abuse its discretion in terminating Father's parental rights under this section.

The trial court also terminated Father's parental rights under 23 Pa. C. S. A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect, or refusal of the parent that causes the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or

will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Child was taken into DHS custody because Father was unable to provide essential parental care: Father was suspected of using drugs in the home and, on more than one occasion, the Child was left without adequate supervision. Father was unable to remedy the causes of his repeated and continued incapacity to provide the Child with essential parental care, control, or subsistence necessary for the Child's physical and mental well-being. Father did not successfully complete any of his SCP objectives. (N.T. 1/17/17, pgs. 10-11, 15-16). Father did not keep in contact with CUA; CUA was unable to reach or find Father. CUA testified that he last had contact with Father in August 2016, when he provided Father with the date and time for his scheduled PCE. Father was aware that he had to complete the PCE, but still did not do so. (N.T. 1/17/17, pgs. 7, 11, 15-16). Father did not comply with his court-ordered drug screens at the CEU since the last court date. While Father claimed that he went for a drug screen on his own at the CEU in January 2017, the CEU's most recent report listed October 2016 as the latest drug screen, upon which Father tested negative with traces of cocaine. Father admitted that he has not completed a drug and alcohol assessment. Father did not engage in drug and alcohol or mental health treatment at any point during the life of the case. (N.T. 1/17/17, pgs. 7-8, 15-16; N.T. 3/15/17, pgs. 6-9). Father does not have suitable housing, as CUA has not been able to assess Father's home. A review of the record shows that Father was referred to ARC for services. Father testified that he is living in a two-bedroom home with his paramour and another child. Father recently moved to a new residence; an apartment in the first floor of a house. Father claims that both his current and previous homes were stable and appropriate. Father only provided information regarding his paramour and other child to CUA for clearances, claiming each apartment is individually locked. Father's house is similar to a rooming house. While CUA was ordered to assess Father's home, Father admitted that he did not schedule an assessment. (N.T. 1/17/17, pg. 16; N.T. 3/15/17, pgs. 5-6, 10-12, 15, 17-19). Father has bi-weekly supervised visits at the agency. Father claims to have last visited with Child in October 2016, while CUA's records show August 2016 as the last time he visited. Father testified that Mother informed him that he was not allowed to see the Child anymore after the October visit. Father admitted that he did not reach out to the court for verification of the frequency of his visits because of his case in criminal court; Father is currently

on probation for a burglary charge. Father was in jail for a period of time. Father admitted that he missed some of the visits. Father did not ask for additional visits at any time during the life of the case. Father does not attend any of the Child's medical appointments. (N.T. 1/17/17, pgs. 16-17, 19; N.T. 3/15/17, pgs. 13-14, 19-21). Father failed to take affirmative steps to place himself in a position to parent the Child. Father was unable to remedy the causes of his incapacities to meet the Child's safety and medical needs. The Child needs permanency, which Father cannot provide. The Child has been in care three different times due to Father's inability to parent and provide safety. Father is not able to take immediate custody of the Child. DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was also proper.

Father also appealed the trial court's termination of parental rights under 23 Pa. C. S. A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond a period of time deemed reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

The Child in this case has been in DHS custody for a total of sixteen months; this is the Child's third time in care. The family has been known to DHS since March 2011. The Child was placed in care because Father was unable parent. Father failed to successfully complete any of his SCP objectives. (N.T. 1/17/17, pgs. 10-11, 15-16). Father did not keep in contact with CUA. CUA testified that his last contact with Father was in August 2016 when he provided Father, in person, with the date and time for his scheduled PCE. Father was aware of his PCE objective, but still did

not complete the PCE. (N.T. 1/17/17, pgs. 7, 11, 15-16). Father did not appear for his court-ordered drug screens at the CEU since the last court date. Father claimed that he was never called to appear for randoms so he went on his own to the CEU for a drug screen in January 2017. Father admitted that he did not receive the results of that drug screen. The most recent November 2016 CEU report indicates Father's last drug screen to be in October 2016, which showed that Father tested negative with traces of cocaine. Father admitted that he did not complete a dual diagnosis drug and alcohol assessment. Father did not engage in drug and alcohol or mental health treatment at any point during the life of the case. (N.T. 1/17/17, pgs. 7-8, 15-16; N.T. 3/15/17, pgs. 6-9). Father does not have suitable housing. A review of the record shows that Father was referred to ARC for services. Father testified that he is living in a two-bedroom home with his paramour and another child. Father recently moved to a different address which is an apartment in a house, which is similar to a rooming house. Father did not provide information for the other tenants in the house to CUA for clearances; he only provided information for his paramour and the other child. Father claims that both his previous and current residences are stable and suitable housing. CUA was previously ordered to assess the home, but Father admitted that he did not schedule an assessment. (N.T. 1/17/17, pg. 16; N.T. 3/15/17, pgs. 5-6, 10-12, 15, 17-19). Father currently has bi-weekly supervised visits at the agency. Father has not been visiting the Child and claims that he last visited with the Child in October 2016, while CUA's records have Father's last visit in August 2016. Father testified that Mother informed him, after the visit in October 2016, that he was not allowed to see the Child anymore. Father admitted that he did not reach out to the court, his attorney, or CUA for verification of the frequency of his visits because of his court case in criminal court; Father is currently on probation. Father had been in jail for a period of time. Father admitted that he missed some visits prior October 2016. Father has not attended any of the Child's medical appointments. (N.T. 1/17/17, pgs. 16, 19; N.T. 3/15/17, pgs. 13-14, 19-21). The trial court heard testimony that adoption would be in the best interests of the Child. (N.T. 1/17/17, pg. 17). Father was given ample time to place himself in a position to parent the Child. The Child cannot wait for Father to decide when to be a parent. This is the third time that the Child is in DHS care. The conditions which led to the placement of the Child continue to exist, and Father cannot and will not remedy them within a reasonable amount of time. At all review hearings, the trial court found reasonable efforts on the part of DHS. As a result, the trial court found that termination of Father's parental rights would be in the best interest of the Child's physical,

intellectual, moral, and emotional well-being. The trial court made this determination on the basis of clear and convincing evidence, so termination under this section was proper.

The trial court also terminated Father's parental rights under 23 Pa. C. S. A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love and comfort, security and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

The Child in this case has been in care for a total of sixteen months because Father was unable to parent; this is his third time in care. Father has not successfully completed any of his SCP objectives and has not placed himself in a position to parent the Child. Father's outstanding objectives were to attend drug and alcohol treatment; to attend mental health treatment; to complete a PCE; to obtain appropriate housing; and to consistently attend his supervised visits with the Child. Father was noncompliant with his SCP objectives. (N.T. 1/17/17, pgs. 10-11, 15-16). Father did not keep in contact with CUA; CUA testified that he last had contact with Father in August 2016, when he provided Father the date and time, in person, for his scheduled PCE. Father was aware of the PCE he had to complete, but still did not complete it. (N.T. 1/17/17, pgs. 7, 11, 15-16). Father did not comply with his court-ordered drug screens at the CEU since the last court date. Father claimed he was not called for any randoms so he went to the CEU on his own and took a drug test in January 2017. The most recent generated CEU report has Father's last drug screen listed in October 2016, which showed that Father tested negative with traces of cocaine. Father admitted that he did not complete a drug and alcohol assessment or engage in mental health

treatment. Father also did not engage in drug and alcohol treatment. (N.T. 1/17/17, pgs. 7-8, 15-16; N.T. 3/15/17, pgs. 6-9). Father does not have appropriate housing; CUA has not been able to assess Father's home. Father has not made any appointments or reached out to CUA. A review of the record reflects that Father was referred to ARC for services. Father testified that he is currently living in a two-bedroom home with his paramour and another child; Father recently moved to a new address which is an apartment in a house, similar to a boarding house. Father only provided CUA with information regarding his paramour and other child for clearances, rather than the other tenants in the house. Father claims that both his current and previous homes were stable and appropriate. Father claimed that CUA was ordered to assess the home, but admitted that a home assessment was never scheduled. (N.T. 1/17/17, pg. 16; N.T. 3/15/17, pgs. 5-6, 10-12, 15, 17-19). Father currently has bi-weekly supervised visits at the agency, but has not been visiting with the Child. Father claims to have last visited with the Child in October 2016, but CUA's records show Father's last visit to be in August 2016. Father claimed that Mother informed him, after the visit in October 2016, that he was not allowed to visit with the Child anymore. Father admitted that he did not verify the frequency of his visits with the court because of his case in criminal court; Father is currently on probation for a burglary charge. Father was incarcerated for a period of time. Father admitted that he missed some of the visits. Father has failed to keep consistent contact with the Child. Additionally, Father does not attend any of the Child's medical appointments. (N.T. 1/17/17, pgs. 16, 19; N.T. 3/15/17, pgs. 13-14, 19-21). Child has been in and out of care for about five years, with a total of sixteen months in care at present, and needs permanency. Child is currently placed with a foster parent who takes care of all of his needs. The Child is doing well in school and is up to date with medical, dental, and vision. The foster parent and the Child have a very caring and loving relationship. The trial court heard testimony that adoption is in the Child's best interest. (N.T. 1/17/17, pg. 17). The conditions that led to the Child's removal from Father's care continue to exist as he failed to successfully complete any of his SCP objectives. The testimony of the DHS witness was credible. Father is not ready, at the time of the termination trial, to parent the Child. As the record contains clear and convincing evidence that termination was in the best interests of the Child, the trial court did not abuse its discretion and termination under this section was also proper.

After a finding of any grounds for termination under section (a), the court must, under 23 Pa. C. S. A. §2511(b), also consider what – if any – bond exists between parent and child. *In re*

*Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* At 762-763. However under 23 Pa. C. S. A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Father currently has bi-weekly visits with the Child, but he has not been visiting with the Child. Father claims his last visit with the Child was in October 2016, but CUA's records showed his last visit to be in August 2016. Father testified that Mother informed him that he was not allowed to visit, but he did not verify the frequency of his visits with the court, his attorney, or CUA. Father admitted to missing some of his visits with the Child prior to speaking with Mother. Father did not ask for additional visits with the Child at any point during the life of the case. The Child does not ask about Father. The Child is in a safe, permanent, and pre-adoptive home with a foster parent who takes care of all of his needs. The Child has a very caring and loving relationship with the foster parent and is bonded to her. The Child reported feeling safe and comfortable with the foster parent. The Child has an IEP and receives mobile therapy. The Child is in first grade and doing very well, with a little trouble in mathematics. CUA testified that the Child would not suffer irreparable harm if Father's parental rights were terminated and that adoption is in the Child's best interests. (N.T. 1/17/17, pgs. 6, 16-19; N.T. 3/15/17, pgs. 13-14, 19-21). The DHS witness was credible. Consequently, the trial court did not err or abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond between Father and Child and that termination of Father's parental rights would not destroy any existing beneficial relationship.

Father also alleges that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*,

763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply instructions received. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father is not currently ready to parent the Child. At the time of the termination trial, Father had not successfully completed any of his SCP objectives. Father did not keep in contact with CUA. CUA testified that he has not had contact with Father since August 2016 when he provided Father, in person, the date and time for his scheduled PCE. Father was aware that he had to complete a PCE, but still did not do so. (N.T. 1/17/17, pgs. 7, 10-11, 15-16). Father was not compliant with his court-ordered drug screens since the last court date. Father claimed that no one called him for his random drug screens, so he went to the CEU on his own for a drug screen in January 2017. Father admitted that he did not receive the results for that drug screen. The most recent CEU report listed an October 2016 drug screen as Father's latest, which showed that Father tested negative with traces of cocaine. Father admitted that he did not complete a drug and alcohol assessment. Father did not engage in drug and alcohol or mental health treatment at any point in the case. (N.T. 1/17/17, pgs. 7-8, 15-16; N.T. 3/15/17, pgs. 6-9). Father does not have suitable housing. A review of the record shows that Father was referred to ARC for services. Father testified that he recently moved to a new address with his paramour and other child; a two bedroom home in an apartment that is part of a house. Father lives in a rooming/boarding house. Father provided CUA with the information for his paramour and another child for clearances, but did not provide any information for the other tenants in the house. Father claimed that both his current and previous homes were stable and appropriate. CUA was previously ordered to assess Father's home, but Father admitted that a home assessment was never scheduled. Father has not made himself available for the home assessment. (N.T. 1/17/17, pg. 16; N.T. 3/15/17, pgs. 5-6, 10-12, 15, 17-19). Father currently has bi-weekly visits with the Child, but has not been attending visits. Father claims his last visit with the Child was in October 2016, but the CUA records show Father's last visit to be in August 2016. Father testified the Mother informed him, shortly after the visit in October 2016, that he was no

longer allowed to visit with the Child. Father admitted that he did not verify the frequency of his visits with the court, his attorney, or CUA because of his case in criminal court; Father is currently on probation for a burglary charge. Father had been previously incarcerated. Father admitted to missing some visits in the past. Father has not attended any of the Child's medical appointments. (N.T. 1/17/17, pgs. 16, 19; N.T. 3/15/17, pgs. 13-14, 19-21). Child is in a safe and permanent home. The Child is doing well in the foster home. All of his medical and educational needs are being met by the foster parent. The Child and the foster parent have a very caring and loving relationship. The trial court heard testimony that adoption is the Child's best interests. (N.T. 1/17/17, pg. 17). The Child needs permanency, which Father cannot provide at this time. The DHS witness was credible. The record established by clear and convincing evidence that the change of permanency goal from reunification to adoption was proper. The trial court did not err or abuse its discretion when it changed the goal to adoption.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights pursuant to 23 Pa. C. S. A. §2511 (a)(1), (2), (5), (8) and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing the Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Father's parental rights and change of goal to adoption were proper and should be affirmed.

By the court,

Joseph Fernandes, J.

Page 17 of 17